No. 21-20547

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

LAUREN VERSAGGI,

Plaintiff—Appellant

v.

KLS MARTIN, L.P.,

Defendant—Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
4:19-cv-02977

**LAUREN VERSAGGI'S BRIEF AS APPELLANT**

Raffi Melkonian
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
(713) 572-4320 (Fax)

**COUNSEL     FOR     PLAINTIFF—
APPELLANT**

# CERTIFICATE OF INTERESTED PERSONS

No. 21-20547

LAUREN VERSAGGI,

Plaintiff—Appellant

v.

KLS MARTIN, L.P.,

Defendant—Appellee

Counsel of Record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| PLAINTIFF—APPELANT | COUNSEL |
|---|---|
| **LAUREN VERSAGGI** | Raffi Melkonian<br>Wright, Close & Barger LLP<br>1 Riverway Drive<br>Houston, TX 77056<br>713-572-4321<br><br>Victor James Versaggi<br>Domengeaux Wright Roy Edwards<br>& Colomb, L.L.C.<br>556 Jefferson Street<br>Lafayette, LA 70501<br>337-233-3033 |

| DEFENDANT—APPELLEE | COUNSEL |
|---|---|
| **KLS MARTIN, L.P.** | Emily H. Mack<br>Marcel L. Debruge<br>Burr & Forman, L.L.P.<br>Suite 3400<br>420 N. 20th Street<br>Birmingham, AL 35203<br><br>Jana H. Woelfel<br>Clark Hill, P.L.C.<br>Suite 2300<br>909 Fannin Street<br>Houston, TX 77010 |

/s/ *Raffi Melkonian*
Raffi Melkonian

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted. This case involves a significant record that counsel could assist the Court to understand in making its decision. Second, this case involves novel issues about the intersection of the Americans with Disabilities Act and the consequences of cyberstalking and stalking. Counsel has not located any other case presenting similar facts or that could provide this Court with a chance to address the issues raised here. Thus, counsel believes oral argument would help the Court in deciding these issues.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................ii

STATEMENT REGARDING ORAL ARGUMENT ................................iv

TABLE OF CONTENTS ................................................................ v

TABLE OF AUTHORITIES ............................................................vii

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF THE ISSUES .......................................................... 2

INTRODUCTION ........................................................................... 4

STATEMENT OF THE CASE ........................................................... 6

    A.   Facts. .................................................................................6

          1.   Lauren Versaggi joins KLS Martin and performs at a high level. ..............................................6

          2.   Versaggi suffers an 11-month campaign of cyberstalking, stalking, and harassment. .....................7

          3.   Cynthia Mendoza is arrested, and Versaggi reports the news to KLS. ..............................................8

          4.   Versaggi seeks an accommodation for the disability caused by the cyberstalking, stalking, and harassment. .............................................9

          5.   Versaggi informs KLS of her formal diagnosis of Adjustment Disorder. ...........................10

          6.   KLS Martin fails to investigate Smith's direct connection to crimes. .......................................11

          7.   KLS blames Versaggi, and Versaggi resigns after being placed in an untenable position. ...............12

B.      Procedural Background........................................................ 15

SUMMARY OF THE ARGUMENT ..................................................... 16

ARGUMENT ....................................................................................... 19

I.      A grant of summary judgment is reviewed de novo.................................................................................... 19

II.      The district court erred in dismissing Versaggi's ADA accommodation claim. ................................................ 20

A.      An      employee      seeking      an      ADA accommodation must inform the employer of their disability in "Plain English," not in any formal way............................................................ 21

B.      Versaggi told KLS about her disability, requested accommodations, and did not get them................................................................................ 23

III.      The district court erred in granting summary judgment on Versaggi's retaliation and constructive discharge claim................................................ 26

A.      The district court's decision that Versaggi did not plead retaliation and constructive discharge is wrong........................................................ 27

B.      The district court could not properly have granted summary judgment. ..................................... 30

IV.      The district court erred in granting summary judgment on her ADA hostile work environment claims................................................................................ 32

CONCLUSION ................................................................................... 34

CERTIFICATE OF SERVICE.................................................................. 35

CERTIFICATE OF COMPLIANCE......................................................... 36

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*Al-Saud v. Youtoo Media, L.P.*,
  754 Fed. App'x 246 (5th Cir. 2018)......................................................29

*AMTRAK v. Morgan*,
  536 U.S. 101 ...................................................................................33

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .........................................................................19

*Ballard v. Rubin*,
  284 F.3d 957 (8th Cir. 2002)............................................................25

*Breaux v. Dilsaver*,
  254 F.3d 533 (5th Cir. 2001)............................................................30

*Burlington N. & Sante Fe Ry. Co. v. White*,
  548 U.S. 53 (2006)...........................................................................31

*Delaval v. PTech Drilling Tubulars, L.L.C.*,
  824 F.3d 476 (5th Cir. 2016).............................................................22

*Dillon v. Rogers*,
  596 F.3d 260 (5th Cir. 2010).............................................................19

*Dussouy v. Gulf Coast Inv. Corp.*,
  660 F.2d 594 (5th Cir. 1981).............................................................28

*EEOC v. Chevron Phillips Chemical Co., L.P.*,
  570 F.3d 606 (5th Cir. 2009).......................................................22, 24

*Flowers v. Southern Regional Physician Serv.*,
  247 F.3d 229 (5th Cir. 2001).............................................................32

*Grabowski v. QBE America, Inc.*,
  2017 WL 1077667 (E.D. Mich. 2017).................................................23

*Griffin v. UPS,*
  661 F.3d 216 (5th Cir. 2011)..............................................................24

*Harrison v. Corrections Corp. v. America,*
  476 Fed. App'x 40 (5th Cir. 2012).....................................................32

*Homoki v. Conversion Servs. Inc.,*
  717 F.3d 388 (5th Cir. 2013)..............................................................27

*Montano v. Texas,*
  867 F.3d 540 (5th Cir. 2017)..............................................................30

*Pierce v. Dep't of the Air Force,*
  512 F.3d 184 (5th Cir. 2007)..............................................................19

*Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.,*
  7 Fed. 4th 301 (5th Cir. 2021) ...........................................................28

*Seaman v. CPSH,*
  179 F.3d 297 (5th Cir. 1999)..............................................................26

*Shaikh v. Texas A&M University College of Medicine,*
  739 Fed. App'x 215 (5th Cir. 2018).....................................................24

*Sherman v. Halbauer,*
  455 F.2d 1236 (5th Cir. 1972)......................................................19, 29

*Simpson v. DeJoy,*
  No. 21-1547, 2021 WL 6124885 (7th Cir. 2021) ................................22

*Stover v. Hattieburg Public School District,*
  549 F.3d 985 (5th Cir. 2008).........................................................29, 30

*Willis v. Cleco Corp.,*
  749 F.3d 314 (5th Cir. 2014)..............................................................32

## Federal Statutes

28 U.S.C. § 1331 .................................................................................1

42 U.S.C. § 12102(2)(A).....................................................................22

42 U.S.C. 12112(a)......................................................................21

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction over this case because Versaggi sued under Title VII and the ADA. 28 U.S.C. § 1331. This Court has appellate jurisdiction because this is a timely appeal of a final judgment of a district court. ROA.1088.

## STATEMENT OF THE ISSUES

1. Plaintiff Lauren Versaggi was subject to a relentless campaign of cyberstalking, stalking, and harassment for eleven months. Ultimately, law enforcement arrested the live-in girlfriend of one of Versaggi's colleagues at KLS Martin, Royal Smith. After this shocking news, Versaggi requested specific accommodations on at least three occasions to address the disabling fear and anxiety she felt from having to work with Smith. KLS rejected her key requests—that Smith be kept away from her, both physically and by any other methods of contact. Even so, the district court held that despite Versaggi's pleas for accommodation, she did not sufficiently put "KLS on notice of [her] alleged disability" under the ADA for her initial requests for accommodation. The question presented is whether the district court erred in granting summary judgment to the defendant on those grounds, or whether there was a triable issue on KLS's fair notice of Versaggi's disability.

2. Versaggi had an immaculate record as an employee. After requesting accommodations under the ADA, however, Versaggi was retaliated against—KLS gave Versaggi false formal reprimands and

performance reviews, was berated, and otherwise put into an intolerable position. The district court granted summary judgment on Versaggi's retaliation and constructive discharge claims because—in the court's view—they were not adequately presented in Versaggi's original state court petition (called the Complaint herein). This was even though the Complaint included direct references to (and alleged facts related to) those claims.

The questions presented are whether (1) the district court erred in holding that Versaggi's Complaint did not allege retaliation and constructive discharge; and (2) alternatively, whether Versaggi's summary judgment opposition should have been read as a motion to amend the pleadings as this Court has repeatedly said would be appropriate?

3.     The district court rejected Versaggi's ADA hostile work environment claim. Did the district court err in granting summary judgment where an employer refused to conduct any investigation of the cyberstalking and stalking incident, subjected Versaggi to abuse and reprimands, and even purged her work file, after discovering an employee's disability?

## INTRODUCTION

Starting in January 2016, Appellant Lauren Versaggi—a highly skilled Physician Assistant with deep experience in high-pressure surgical environments—found herself the target of a relentless campaign of cyberstalking, stalking, and harassment. She received dozens of calls a day from unknown callers over eleven months. She was mocked and derided by anonymous accounts on social media. And when she changed her cell phone number to stop the harassment, the calls began quickly again after a short respite. Versaggi suffered extraordinary mental distress because of this vicious campaign. The record is full of the consequences she experienced: insomnia, loss of appetite, night terrors, anxiety, and fear.

The second shoe dropped when one of the perpetrators was arrested. The calls and posts had been made by Cynthia Mendoza, the live-in girlfriend of Versaggi's colleague at Defendant KLS Martin, Royal Smith. It soon became clear that another of Smith's former girlfriends might have also been involved. Yet when Versaggi begged her employer KLS Martin for accommodations to address the fear, terror, and anxiety she felt because of Smith's continued work at KLS,

her requests were denied, she was told by HR to "grow up," and even told that Smith "may be a victim too."

The district court granted summary judgment in KLS's favor on Versaggi's claims for reasonable accommodation, retaliation, and hostile work environment under the ADA. Each of those decisions was error. But perhaps the clearest path to reversal is on Versaggi's reasonable accommodation claim. The premise of the district court's decision—that Versaggi never told KLS that she had a disability—both misreads the summary judgment evidence and jumps to conclusions only a jury could reach. The record evidence shows that at a minimum, KLS knew *why* Versaggi was experiencing mental health challenges, knew she was *anxious*, knew she was *terrified*, and knew she needed an *accommodation*. That creates (at the very least) a fact question about whether Versaggi could be fairly said to have invoked the ADA. The judgment below should be reversed on that ground alone, as well as the others set forth in greater detail below.

## STATEMENT OF THE CASE

A.   **Facts**.

>   **1.   Lauren Versaggi joins KLS Martin and performs at a high level.**

KLS Martin Group is a leading supplier of medical technology. Plaintiff Lauren Versaggi is an extremely experienced board-certified Physician Assistant, with a background in Cardiovascular Surgery and Facial Plastic Surgery. *See, e.g.*, ROA.965 (describing the tasks she undertakes).

In 2013, she began working for KLS as a Cardiothoracic Sales Specialist. ROA.731; ROA.738.[1] Throughout her time with KLS, she had excellent results, earning large increases in her pay and being awarded the "110%" award for excellent results. ROA.740. Versaggi also earned large bonuses tied to her outstanding results. ROA.740. Despite later claiming dissatisfaction with Versaggi's performance and attitude, as late as January 2018, KLS was lauding Versaggi for her "terrific year," noting the "many complimentary remarks" about her work, and stating that her "numbers and performance overall" had been "terrific"

---

[1]   While working at KLS, Versaggi at first focused on a product called the "Sternal Talon"—a powerful titanium device that closes the breastbone after serious surgeries. ROA.738; *see generally* National Institute for Health and Care Excellence, *Sternal Talon for sternal closure in cardiothoracic surgery*, available at https://www.nice.org.uk/advice/mib88/chapter/the-technology.

since joining KLS. ROA.836. In Versaggi's own words, she developed a "reputation amongst surgeons that if they had a problem they might tell their friend in a different state that I helped them." ROA.741.

### 2. Versaggi suffers an 11-month campaign of cyberstalking, stalking, and harassment.

Beginning in January 2016, Versaggi faced a course of extreme cyberstalking, stalking, and harassment that turned her life into a nightmare. Versaggi began receiving dozens of calls from a "no caller ID number" "all night, all day, just continuously." ROA.497; ROA.757. If she answered her phone, the caller would not speak and Versaggi would "just hear breathing on the other end of the telephone … heavy breathing." ROA.497. While continuing the telephone harassment, ROA.757, the stalker then began posting demeaning pictures of Versaggi from many fake accounts on social media (including Facebook and Instagram). *See, e.g.*, ROA.800; ROA.826-827 (discussing offensive Instagram posts about Versaggi posted by another of Smith's former girlfriends, Anahi Cano). During this terrible period of harassment, Versaggi kept KLS up to date with what she was experiencing. In particular, she told KLS that she had to change her phone number because the harassment was "destroying my life." ROA.758. But even

that drastic step did not help—soon after Versaggi changed her number, the calls began again. ROA.758; ROA.800. Whomever was harassing Versaggi had access to her private information. Versaggi filed a police report and an investigation was conducted. ROA.758.

### 3. Cynthia Mendoza is arrested, and Versaggi reports the news to KLS.

In November 2016, a woman named Cynthia Mendoza was arrested for the harassment and charged with cyberstalking and stalking. ROA.802. Astonishingly, Versaggi learned that Mendoza was the girlfriend of KLS Martin employee Royal Smith. ROA.802. Smith dated (and in fact, at one point cohabitated with) Mendoza from December 2014 through November 2016. ROA.759 Along with this connection with Mendoza, Smith also admitted that a second former romantic interest named Anahi Cano was also involved with the crimes against Versaggi. ROA.827-828. Despite this inexplicable link between two women and attacks on Versaggi, Smith asserted he had "no idea" why such posts had been made. ROA.828. Versaggi testified that the federal prosecutor Luke Walker stated that he did not believe Mendoza to have acted alone. ROA.761.

**4.     Versaggi seeks an accommodation for the disability caused by the cyberstalking, stalking, and harassment.**

On November 21, 2016, Versaggi notified Cherie Johnson, KLS's HR manager that she was the victim of these crimes. Versaggi stated that "I feel very uncomfortable being around Royal Smith at this time" and stated that she needed to "request an accommodation regarding working with Royal Smith, as he is tied to the person being arrested for criminal activity that has deeply affected my life." ROA.838-39. Versaggi further noted that she was "unable to sleep" because of her condition and was "genuinely frightened for [her] safety." ROA.838. Versaggi also requested the chance to "fill out any appropriate paperwork to file a formal document detailing the events of this situation." ROA.839. The accommodation Versaggi requested was to not be in any in-person meetings or on phone calls with Smith. ROA.840. KLS failed to fully accommodate Versaggi in response to this request, nor did it engage in any

On December 5, 2016, Versaggi wrote another note to her manager, Monte Gardner, requesting that she no longer be required to share her physical location (in terms of business trips and meetings) on

weekly group emails. ROA.910. Cherie Johnson wrote, in response to this email (in an internal note) that Versaggi was "terrified" and "scared" because of the situation with Mendoza. ROA.916. This request too was denied, even though Versaggi kept "many voicemails" from Gardner praising Versaggi as doing an "unbelievable job," as the "best … there is" and stating that he "couldn't be happier with what you're doing." ROA.796. Versaggi was also forced to be on weekly teleconference calls with Smith, which greatly increased her anxiety.

### 5. Versaggi informs KLS of her formal diagnosis of Adjustment Disorder.

The trauma Versaggi suffered because of the stalking, cyberstalking, and harassment caused her to seek a formal diagnosis of her disability. Versaggi's physician, Dr. Kristin Calverly, diagnosed her with Adjustment Disorder with Anxiety. ROA.844-846. As Dr. Claverly noted, consistent with Versaggi's disclosures to KLS, Versaggi's symptoms included insomnia for over a year, extreme fright, anxiety, the inability to eat on a consistent basis, and other emotional distress symptoms. ROA.844-846. Her working conditions were intolerable, so Dr. Calverley provided cognitive behavioral therapy and coping skills strategies to manage Versaggi's anxiety disorder. *See, e.g.*, ROA.847. In

addition to Dr. Calverly's medical records, Dr. Calverley also completed a "CVR Claim For Disability Verification" dated April 3, 2019. ROA.775. On this form, Dr. Calverley states, "Patient reported a history of stalking by a coworker that led to persistent anxiety and insomnia symptoms." ROA.775.

### 6.      KLS Martin fails to investigate Smith's direct connection to crimes.

The summary judgment evidence shows that Mendoza got Versaggi's personal details from Royal Smith. One of the prosecutors in charge of the Mendoza case testified that Mendoza was dating Royal Smith and confirmed that "it appeared that Ms. Mendoza was then able to obtain both Ms. Versaggi's original cell phone number as well as her new cell phone number immediately after Ms. Versaggi changed telephone numbers." ROA.792.

Later, KLS Martin's Chief Financial Officer, Kevin Bass, insisted that Versaggi attend the National Sales Meeting where Royal Smith would be present, and refused to accommodate Versaggi by keeping him away, noting that excluding Smith would "keep him behind his peers" and expressing his "hope we can put this behind us and move on." ROA.796.

Smith later testified that as far as he could remember, he spoke to KLS's human resources department once about the incident. ROA.816. (claiming he was sure at least one call had happened, but asserting he could not recall any other calls). Gregory Lunny, KLS's corporate representative, could not remember any "remedial measures that KLS took against Mr. Smith or any other employees following Ms. Versaggi's complaints regarding Ms. Mendoza'." ROA.707 (*citing* Lunny deposition).

### 7. KLS blames Versaggi, and Versaggi resigns after being placed in an untenable position.

Versaggi requested another ADA accommodation regarding attending a company-wide conference, the National Sales Meeting, on December 6, 2017. Given that there was still an ongoing investigation and criminal proceedings, she requested that Smith not attend that meeting. She repeated that request on December 8, 2018.    KLS   did nothing in response to Versaggi's reporting. ROA.795. KLS's new HR manager, Melissa Moe, rejected Versaggi's concerns, observing, among other things, that "KLS has to effectively run a business and cannot continue to keep two people apart." ROA.795. She even claimed that "Royal may be a victim too," even though Royal Smith was the only

12

person who could have given Mendoza Versaggi's personal phone numbers.

On December 11, 2017, Melissa Moe and KLS's Chief Financial Officer, Kevin Bass, called Versaggi to again deny this request for accommodation. Bass explained that he refused to accommodate Versaggi by keeping Smith away from the National Sales Meeting, noting that excluding Smith would "keep him behind his peers" and expressing his "hope we can put this behind us and move on." ROA.796. Moe and Kevin Bass also told Versaggi that she needed to "act like an adult" and move on from the situation. ROA.511; ROA.766. KLS was insistent that Versaggi attend this in-person meeting with Smith present, complained that the company was "in limbo" and implied that Royal Smith needed to be protected too (again implying he was a kind of victim). ROA.583.

Versaggi requested an accommodation once again on January 8, 2018, after the decision permitting Smith to attend the National Sales Meeting. ROA.777. In that letter, she stated that being "in the presence of an employee of KLS Martin" who was "directly affiliated" with the person charged with stalking and cyberstalking "causes extreme stress

and anxiety for me." ROA.777. Versaggi therefore requested that she be "excused from attending the National Sales Meeting in person." ROA.777. While that request was eventually honored, the evidence shows that far from investigating Royal Smith's actions, or taking Versaggi's worries seriously, KLS Executive Leadership called Versaggi a "troublemaker" and said that she "should no longer be employed." ROA.779. On top of that, KLS issued a false formal warning to Versaggi about her job performance in connection with a "cadaver lab," ROA.801, after which one of her supervisors had a call with her where he was "screaming" at her. ROA.530. Versaggi later discovered another formal warning she had never seen before during discovery, but could not verify what it was about because the rest of her personnel file had been purged.   Furthermore, this alleged warning notice was neither signed nor dated. ROA.832.

This situation was, to Versaggi, "intolerable." ROA.514. Versaggi ultimately resigned from her employment with KLS. As she explained, she did not want to leave her job. ROA.833. But Versaggi was forced to do so because her "request for a reasonable accommodation" caused her

to be "retaliated against and treated different than others" in her same role. ROA.833.

After Versaggi left KLS, she discovered that all of her personnel files had been "purged" by KLS. When she asked why this had happened, she was told by the company CFO, Bass, that "people do crazy things." ROA.801.

## B.    Procedural Background.

The district court granted summary judgment. ROA.1067. First, the district court analyzed Versaggi's ADA failure to accommodate claim, based on what the court characterized as three separate requests for accommodation: November 21, 2016, December 5, 2016, and January 8, 2018.    ROA.1071. As to the first two, the district court held that Versaggi "concede[d]" that she did not "inform KLS of her alleged disability until January 8, 2018." ROA.1072-73. Thus, because KLS did not know about her disability, and the disability was not "obvious or apparent," the court found that KLS did not have to make any accommodation. ROA.1073. As to Versaggi's January 8, 2018 request, the district court held that it had in fact been accommodated because she was not required to attend the relevant meeting. ROA.1073-74. The

court did not recognize that Versaggi's first request—that *she* be allowed to attend the meeting without Smith, had been denied.

Next, the district court turned to Versaggi's hostile work environment claims. As for her ADA claim, the district court held that Versaggi *had* exhausted her administrative remedies, ROA.1077, but that her claims failed at summary judgment on the merits. The district court then held that Versaggi had *failed* to exhaust her administrative remedies with respect to her Title VII hostile work environment claim. ROA.1079. The district court did not reach any aspect of that claim on the merits. ROA.1079.

Third, the district court rejected Versaggi's retaliation and constructive discharge claims solely because those claims were not adequately pleaded in her complaint. ROA.1081. The district court did not reach the merits of either of those claims. ROA.1080-81.

## SUMMARY OF THE ARGUMENT

This Court should reverse the judgment below on Versaggi's ADA accommodation, hostile work environment, and retaliation claims.

First, the district court erred in granting judgment on Versaggi's reasonable accommodation claim. The district court's conclusion that

Versaggi did not inform KLS of her disability at the correct time is incorrect. The ADA is not meant to erect an impossible barrier to invoking the statute's protections. Instead, although of course the employer must be told about the disability and the request for accommodation, plain English can trigger the employer's obligations. Versaggi here made clear to KLS that she was experiencing disabling symptoms from the months of harassment and the knowledge that what she believed was the harasser's accomplice worked with her at KLS, and she asked for an accommodation. That is more than enough to invoke the ADA for summary judgment.

The district court also erred in denying Versaggi's retaliation and constructive discharge claims. The court's conclusion those claims were not even before it because Versaggi's initial state court petition did not separate out retaliation as a cause of action (but alleged the facts underlying her claim) is simply wrong. For one thing, such a complaint must be read as a whole, consistent with all the allegations. In that context, the pleading was more than enough to put KLS on notice of Versaggi's retaliation claim. Further, this Court has been clear that a district court "should" consider an apparently new claim raised in

opposition to summary judgment to be a motion to amend the pleadings out of time, and should grant the motion consistent with the Federal Rules' commitment to liberal amendments. Thus, even if the Complaint could not properly be read to include retaliation and constructive discharge, it should have been considered amended by the summary judgment briefing.

Third, the district court erred in granting judgment on Versaggi's hostile work environment claim. Versaggi was discriminated against because of her disability. She was treated poorly, subjected to invented disciplinary actions, her pleas for help ignored, and, most important, KLS refused to investigate Smith's involvement in Mendoza's crime. Again, at the summary judgment stage, that is sufficient evidence of a prima facie case.

# ARGUMENT

## I.    A grant of summary judgment is reviewed de novo.

Summary judgment is proper if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court construed all facts and inferences in the light most favorable to the non-moving party. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).   This Court reviews a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Pierce v. Dep't of the Air Force*, 512 F.3d 184, 186 (5th Cir. 2007).

As for part of the argument set forth in Part III.A—that the district court should have considered Versaggi's opposition to summary judgment to be a motion to amend the complaint—the standard of review is abuse of discretion. That said, this Court has made clear that in many cases a court "should" exercise its discretion in the plaintiff's favor, as it should here. *Sherman v. Halbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972).

## II.    The district court erred in dismissing Versaggi's ADA accommodation claim.

The district court held that Versaggi did not tell KLS about her disability until 18 months after the problem arose, but rather only informed KLS as of January 8, 2018. As a result, the court held, her claims for ADA accommodations before that date necessarily failed. ROA.1073. The court reached no other question on Versaggi's reasonable accommodation claim under the ADA. *See, e.g.*, ROA.1073, n. 9.

This conclusion misconstrues the law and ignores a clear issue of disputed fact. Specifically, the district court erred in its analysis of whether Versaggi's clear requests for an accommodation and explanations of why she needed that accommodation sufficiently triggered the ADA. Because under the proper standard Versaggi easily satisfied the statute, particularly at the summary judgment stage, the judgment should be reversed. And because the district court did not go any further in analyzing Versaggi's claim, this court need go no further to reverse.[2]

---

[2] Versaggi cannot know at this point if KLS will raise alternative grounds for affirmance in its opposing brief, or what those alternative grounds could be, and will address any such arguments in its reply brief if necessary. Even so, Versaggi

### A. An employee seeking an ADA accommodation must inform the employer of their disability in "Plain English," not in any formal way.

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. 12112(a). Discrimination includes "not making *reasonable accommodations* to the known physical or mental limitations of an otherwise qualified individual with a disability … unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* 12112(b)(5)(A) (emphasis added).

Thus, a plaintiff seeking accommodation under the ADA must show that (1) she is a qualified individual with a disability; (2) the disability and its consequential limitations were known to the employer, unless those limitations were "open and obvious"; and (3) the employer failed to make reasonable accommodations. But employee "does not have to mention the ADA" or use the phrase "reasonable

---

notes now that her ADA reasonable accommodation claim was timely exhausted, and that there is a disputed issue of material fact as to whether KLS reasonably accommodated her requests. These arguments are in the summary judgment briefs below. Again, this Court need not (and should not) reach any of those questions, because they were not reviewed by the district court. *See Wedgeworth v. Home Indem. Co.,* 91 F.3d 140, at *5 (5th Cir. 1996) (calling affirmance on alternative grounds "a discretionary tool") (unpublished).

accommodation." *EEOC v. Chevron Phillips Chemical Co., L.P.*, 570 F.3d 606, 621 (5th Cir. 2009). "Plain English" is enough. *Id.*

Once an employee has requested an accommodation, an employer "must engage in the interactive process, or a flexible dialogue, with the employee with the goal of finding an appropriate accommodation for the limitation." *Delaval v. PTech Drilling Tubulars, L.L.C.*, 824 F.3d 476, 481 (5th Cir. 2016). Finally, the kind of anxiety and fright that a person develops after being a crime victim qualifies as a disability so long as it effects major life activities of an individual. 42 U.S.C. § 12102(2)(A). *See, e.g.*, *Simpson v. DeJoy*, No. 21-1547, 2021 WL 6124885, at *2 (7th Cir. 2021) ("We can assume that the anxiety Simpson developed after the armed robbery … qualifies as a disability under the Rehabilitation Act"). As the EEOC has explained, an employee "can get a reasonable accommodation for any mental health condition that would, if left untreated, substantially limit your ability to concentrate, interact with others… or do any other 'major life activity.'" EEOC, *Depression, PTSD & Other Mental Health Conditions in the Workplace: Your Legal Rights*, available at https://www.eeoc.gov/laws/guidance/depression-ptsd-other-mental-health-conditions-workplace-your-legal-rights.

**B.    Versaggi told KLS about her disability, requested accommodations, and did not get them.**

The district court held that Versaggi "conced[ed] she did not inform KLS of her alleged disability until January 8, 2018...." ROA.1072. There was no such concession. January 8 is when Versaggi told KLS about her *formal* diagnosis, and asked for another accommodation (being allowed not to attend the National Sales Meeting). But the record shows that Versaggi repeatedly told KLS in 2016 about her need for accommodation (to no avail) and that she asked for a different accommodation in December 2017 and did not that get one either.

To be sure, before providing the Calverly medical note in January 2018, Versaggi did not say, "I have a disability under the ADA and request a reasonable accommodation" in so many words. But as explained above, the law does not require such formalistic magic words to invoke the ADA, nor does it require an official or formal diagnosis. *See e.g.*, *Grabowski v. QBE America, Inc.*, 2017 WL 1077667 (E.D. Mich. 2017) (calling a formal diagnosis "of little consequence"). The relevant question is whether KLS could be "fairly said"—from the "plain English" of the employee's request—to have known of both a disability

23

and a desire for an accommodation sufficient to survive summary judgment. *See Shaikh v. Texas A&M University College of Medicine*, 739 Fed. App'x 215, n. 7 (5th Cir. 2018).

Under that correct standard, the record shows that Versaggi was clear with KLS from the beginning that she needed an accommodation, and that this need was grounded not in some kind of inchoate preference or whim, but from the fear and anxiety she experienced from being around Royal Smith. She was further clear that this fear and anxiety was causing her a wide variety of symptoms that limited major life activities, including sleeping and eating. *See, e.g.*, *Griffin v. UPS*, 661 F.3d 216, 222 (5th Cir. 2011) ("It is established in this circuit that eating is a major life activity"); *Chevron*, 570 F.3d at 616  (sleeping and thinking are major life activities). This was true for the November 21, 2016, December 5, 2016, *and* December 6-8, 2017 accommodation requests, as well as Versaggi's attempts after those dates to get KLS to work with her. On November 21, 2016, for example, Versaggi told KLS that she needed to request accommodation in regard to working with Royal Smith, including in-person meetings and phone calls, "as he is tied to the person being arrested for criminal activity that has deeply

affected my life" and that this was causing her to be "unable to sleep." ROA.838. And on December 5, 2016, Versaggi contacted Monte Gardner, requesting that she no longer be required to share her physical location (in terms of business trips and meetings) on weekly group emails. ROA.910. KLS's HR manager wrote (in an internal note) that Versaggi was "terrified" and "scared" and "anxious" because of the situation with Mendoza. ROA.916; ROA.841 (describing Versaggi's attitude towards future events).

The cumulative effect of these statements was clear: Cherie Johnson, who was the HR manager for KLS beginning in July 2016 until July 2017, ROA.778, ¶2, testified that Versaggi "made us aware" of her "mental state" and "perceived emotional condition" during the time she worked at KLS. ROA.780. Given those facts, the district court's conclusion that there is not even a triable issue of fact about whether KLS had sufficient notice of Versaggi's need for accommodation before January 8, 2018 is not credible. *See also Ballard v. Rubin*, 284 F.3d 957, 963 (8th Cir. 2002) (noting that even *affirmative statements* rejecting *accommodations* might be held to create a "triable issue of fact" on knowledge where other statements counterbalanced them).

**III.    The district court erred in granting summary judgment on Versaggi's retaliation and constructive discharge claim.**

In both her Complaint and in her opposition to summary judgment, Versaggi pressed her claim that KLS Martin retaliated against her for seeking an accommodation under the ADA. A claim of unlawful retaliation under the ADA requires a plaintiff to make prima facie showing that (1) she engaged in an activity protected by the ADA, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected act and the adverse action. *See Seaman v. CPSH*, 179 F.3d 297, 301 (5th Cir. 1999). *See also Feist v. Louisiana Dep't of Justice¸*730 F.3d 450, 454 (5th Cir. 2013) (same).

The district court granted judgment for KLS because the retaliation claim was not adequately pleaded in Versaggi's complaint. That was wrong, and requires reversal for a first analysis by the district court. Even if this Court analyzes whether to affirm the claim on alternative grounds, summary judgment should have been denied. Versaggi set forth a prima facie claim of retaliation and constructive discharge. Those claims should be remanded for trial.

**A.    The district court's decision that Versaggi did not plead retaliation and constructive discharge is wrong.**

The district court granted summary judgment on Versaggi's ADA claim just because it concluded that the claim was not properly contained in the Complaint (and therefore could not properly be raised at summary judgment). This was error in at least two ways. *First*, as the district court rightly acknowledged, retaliation *is* mentioned in the Complaint, just not as a separate cause of action. The Complaint alleges that the "Defendant began *retaliating* against Plaintiff for reporting her diagnosed disability…." ROA.63. The Complaint also alleges that this retaliation consisted of, among other things, a false "formal write up." ROA.63. In construing a Complaint, this Court has been clear that "[s]o long as a pleading alleges facts upon which relief can be granted, it states a claim even if it fails to categorize correctly the legal theory giving rise to the claim." *Homoki v. Conversion Servs. Inc.*, 717 F.3d 388, 402 (5th Cir. 2013).    The "form" of the complaint "is not significant" if it alleges facts on which relief can be granted—and there is no reason why that should be less true at summary judgment than it

would have been under Rule 12(b)(6). *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 604 (5th Cir. 1981).[3]

The record also is clear that KLS was forewarned of the retaliation claim. Versaggi made this allegation in her charge of discrimination. ROA.803 ("KLS's actions constitute sex and disability discrimination, retaliation, and constructive discharge"). KLS also included retaliation in some of its affirmative defense. ROA.111 (Second Defense); ROA.113 (Fourteenth Defense); ROA.114 (Sixteenth Defense). Versaggi also stated her retaliation claim in response to KLS's interrogatories. ROA.324; ROA.392 (noting a witness who could testify about "retaliatory treatment"). And of course, this is the same claim raised specifically in the opposition to the summary judgment motion. Everyone involved knew (or at least should have known) that Versaggi was making a retaliation claim and that it could be part of summary judgment briefing.

---

[3] Although *Dussouy* was of course a pre-*Twiqbal* case, its teaching was not vitiating by that case, and it continues to be cited by this Court as good law. *See, e.g.*, *Sanchez Oil & Gas Corp. v. Crescent Drilling & Prod., Inc.*, 7 Fed. 4th 301 (5th Cir. 2021) (citing *Dussouy* for liberal construal of pleadings that allege the relevant facts).

*Second*, even if it were not mentioned in the Complaint, this Court has long held that a response to a motion for summary judgment raising a new claim *should* be treated as a motion to amend the complaint, and if the applicable standard is met, may be granted. *See, e.g., Al-Saud v. Youtoo Media, L.P.*, 754 Fed. App'x 246, 256 (5th Cir. 2018) (citing cases for proposition that pleading defects can be resolved in a summary judgment motion); *Sherman v. Hallbauer*, 455 F.2d 1236, 1242 (5th Cir. 1972) (reversing the district court because it did not construe an opposition to summary judgment as a motion to amend the pleadings with respect to plaintiff's theory of the case); *Stover v. Hattieburg Public School District*, 549 F.3d 985 n. 2 (5th Cir. 2008) (collecting cases on similar amendments).

Given the circumstances, even if the district court properly read the Complaint not to raise retaliation (although it did) the district court should have granted a motion to amend under *Sherman*. As noted above, KLS had plenty of advance warning about the retaliation claim. They had all the opportunity they needed to conduct discovery on those claims. Again, as noted above, KLS did exactly that. Just as in *Sherman*, "the district court *should* have construed" Versaggi's

"memorandum in opposition to summary judgment as a motion to amend the pleadings filed out of time." *Id.* (emphasis added). The district court's failure to do so (and indeed to even analyze that point) was an abuse of discretion that requires reversal.

The judgment dismissing Versaggi's constructive discharge claim should be reversed for the same reasons. In particular, the Court should have treated Versaggi's arguments in opposing KLS's motion for summary judgment to act as an amendment to the Complaint. ROA.728-29.

## B. The district court could not properly have granted summary judgment.

If this Court agrees that the district court should not have dismissed the retaliation claim because the Complaint was inadequate, the Court can stop there and remand that claim. A court of appeals sits as a "court of review, not first view." *Montano v. Texas*, 867 F.3d 540, 546 (5th Cir. 2017). Remand would be appropriate to allow the district court to take the first pass on the summary judgment question.

To be sure, in some cases this Court can affirm on alternative grounds, although here it should not. *See also Breaux v. Dilsaver,* 254 F.3d 533, 537 (5th Cir. 2001) ("Although this court may decide a case on

any grounds that was presented in the trial court, we are not required to do so*"*). Versaggi will respond in detail to whatever arguments KLS makes on the merits of the retaliation and constructive discharge claim in its reply brief, including on the wisdom of deciding any unreached issues at the first instance.

To summarize at this stage, however: (1) there does not appear to be any dispute that Versaggi undertook actions protected by the ADA by seeking reasonable accommodations. (2) Versaggi amply showed a dispute of material fact about whether she suffered an adverse employment action. As the Supreme Court has made clear, that adversity can be shown by any action that "a reasonable employee would have found [to be] materially adverse...." *Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). That is, a plaintiff can make a claim of retaliation if they can prove the actions "well might have dissuaded a reasonable worker" from taking the protected act. *Id.*

The record here shows many acts that, at the summary judgment stage, are more than enough to satisfy this test: (a) the false "write-ups" Versaggi suffered in February 2018, and the screaming incident with Versaggi's supervisor; (b) KLS's refusal to investigate Smith's

involvement in Mendoza's misconduct; (c) the fact that Versaggi had to remain on weekly phone calls with Smith and continue to disclose her physical location on weekly group emails. ROA.514. *See, e.g.*, *Willis v. Cleco Corp.*, 749 F.3d 314, 318 (5th Cir. 2014) (reprimand can be sufficient evidence of retaliation); *cf. Harrison v. Corrections Corp. v. America*, 476 Fed. App'x 40, 45 (5th Cir. 2012) (mere "verbal reprimands" are trivial harms that are not actionable). Versaggi can satisfy the test for summary judgment on her retaliation claim.

## IV. The district court erred in granting summary judgment on her ADA hostile work environment claims.

To establish a hostile work environment claim under the ADA, Versaggi must prove she (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment was based on her disability; and (4) the employer knew or should have known of the harassment and failed to take prompt remedial action. *Flowers v. Southern Regional Physician Serv.*, 247 F.3d 229, 236 (5th Cir. 2001). As with Title VII cases, the courts consider the entirety of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it

unreasonable interferes with an employee's work performance. *See AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002).

Applying these legal standards under the ADA to Versaggi's KLS work environment, KLS subjected her to a hostile work environment based on the continuous harassment, stalking and cyberstalking by Smith's girlfriend and, by implication, Smith. KLS simply accepted Smith's blanket denial that he was not involved and did not conduct an investigation "reasonably calculated" to end the harassment or take prompt remedial action. Indeed, there is no evidence that KLS conducted an "investigation into Royal Smith" after Versaggi's reporting. ROA.779. To the contrary, Officer Matthew Vasquez, a Special Agent for the Louisiana Bureau of Investigation, reported that he was stonewalled when he tried to get KLS to preserve evidence. ROA.789-790, and specifically said that KLS's CFO, Bass, "refused my request."

KLS also invented false complaints about Versaggi. This includes the false reprimands about the cadaver lab discussed above, as well as KLS's claim that one Dr. Patrick Greiffenstein—had complained about Versaggi's conduct. *See, e.g.,* ROA.713 (citing Lunny testimony about

Greiffenstein statement). In fact, Dr. Greiffenstein testified that "any testimony that would indicate I have said anything negative whatsoever about Versaggi is completely untrue," and that Versaggi "has been nothing but incredibly professional, helpful, and diligent." ROA.788. Viewing these facts from an objective and subjective point of view, Versaggi faced a hostile work environment at KLS.

## CONCLUSION

The judgment below should be reversed, and the case remanded for trial.

Respectfully submitted,

*/s/ Raffi Melkonian*
Raffi Melkonian
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas  77056
(713) 572-4321
(713) 572-4320 (Fax)
melkonian@wrightclosebarger.com

**COUNSEL    FOR    PLAINTIFF—APPELLANT**

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2022, I electronically transmitted the attached Brief of Appellant to the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit using the Court's ECF System, which sent a Notice of Electronic Filing to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means. I further certify that I have sent a copy of this document via United States First Class Mail, postage prepaid, to the attorneys of record.


*/s/ Raffi Melkonian*
Raffi Melkonian

## CERTIFICATE OF COMPLIANCE

1.   This brief complies with the type-volume limitation of Fed. R. App.
     P. 32(a)(7)(B) because this brief contains 5,986 words, excluding
     the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App.
     P. 32(a)(5) and the type style requirements of Fed. R. App. P.
     32(a)(6) because this brief has been prepared in a proportionally
     spaced typeface using Microsoft Word 2003 in Century Schoolbook
     (Scalable) 14pt for text and Century Schoolbook (Scalable) 12pt for
     footnotes.

                                   */s/ Raffi Melkonian*
                                   Raffi Melkonian